NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 12, 2025

S25A0632. ROBINSON v. THE STATE.

COLVIN, Justice.

Appellant Kenneth Robinson appeals his convictions for malice murder and other crimes related to the shooting death of Devontae Jones and the aggravated assault of Charmisa Witherspoon.[1] On

---

[1] The crimes occurred between late September and early October of 2008. On November 18, 2008, a Fulton County grand jury returned a 22-count indictment against Appellant and other co-indictees. Appellant was charged with 20 of the 22 crimes, including participation in criminal street gang activity (Count 1), conspiracy to commit aggravated assault against Jesus Cintron (Count 2), malice murder of Cintron (Count 3), malice murder of Fernando Wingfield (Count 4), felony murder of Cintron (Count 5), felony murder of Wingfield (Count 6), aggravated assault with a deadly weapon against Cintron (Count 7), aggravated assault with a deadly weapon against Wingfield (Count 8), aggravated assault against Cintron (Count 9), possession of a firearm during commission of a felony, that is, the aggravated assault of Cintron (Count 10), possession of a firearm during the commission of a felony, that is, the aggravated assault of Wingfield (Count 11), conspiracy to commit a crime, that is, the murder of Jones and Witherspoon (Count 12), malice murder of Jones (Count 13), felony murder of Jones (Count 14), criminal attempt to murder Witherspoon by holding a handgun to her head and pulling the trigger (Count 15), aggravated assault with a deadly weapon against Jones (Count 16), aggravated assault with a deadly weapon against Witherspoon by

shooting at, toward, and in her direction with a handgun (Count 17), possession of a firearm during commission of a felony, that is, the aggravated assault of Jones (Count 18), possession of a firearm during commission of a felony, that is, the aggravated assault of Witherspoon (Count 19), and aggravated cruelty to animals (Count 20).

Appellant was tried before a jury with codefendants John Auletta, Darryl Christmas, Derek Davis, and Scott Tobin from October 19, 2010, through November 5, 2010. The trial court granted Appellant a directed verdict on Counts 3 (malice murder of Cintron), 4 (malice murder of Wingfield), 5 (felony murder of Cintron), 6 (felony murder of Wingfield), 7 (aggravated assault with a deadly weapon against Cintron), 8 (aggravated assault with a deadly weapon against Wingfield), 10 (possession of a firearm during commission of a felony, that is, the aggravated assault of Cintron), 11 (possession of a firearm during commission of a felony, that is, the aggravated assault of Wingfield), and 15 (criminal attempt to murder Witherspoon by holding a handgun to her head and pulling the trigger). Count 20 for aggravated cruelty to animals was dead docketed and later nol prossed. The jury found Appellant guilty on all remaining counts except Count 9 (the aggravated assault of Cintron).

The trial court sentenced Appellant to 15 years in prison for participation in criminal street gang activity (Count 1); 10 years for conspiracy to commit aggravated assault against Cintron (Count 2) to run concurrently with Count 1; life for the malice murder of Jones (Count 13) to run consecutively to all other counts; 20 years for the aggravated assault of Witherspoon (Count 17) to run consecutively to all other counts; and 5 years for each conviction for the possession of a firearm during the commission of a felony, that is the aggravated assaults of Jones and Witherspoon (Counts 18 and 19, respectively) to run consecutively to all other counts. Counts 12, and 16 merged into Count 13 for sentencing purposes. Count 14 for the felony murder of Jones was vacated by operation of law. See *Hulett v. State*, 296 Ga. 49, 53 (2) (766 SE2d 1) (2014) ("[W]hen a valid guilty verdict is returned on both malice murder and felony murder of the same victim, the defendant should be sentenced for the malice murder, and the alternative felony murder count stands vacated by operation of law[.]").

The trial court modified the sentences on December 10, 2010, imposing a life sentence for the malice murder of Jones (Count 13) to run consecutively to Count 1; a 20-year sentence for the aggravated assault of Witherspoon (Count 17) to run consecutively with Count 13; and five-year sentences for possessing a firearm during the aggravated assaults of Jones and Witherspoon (Counts 18 and 19, respectively) to run consecutively to each other and

appeal, Appellant argues that trial counsel was ineffective for failing to inform him of a plea offer; that the trial court's sentencing procedure violated his rights under the United States Constitution and Georgia law; that the trial court abused its discretion because it did not understand the breadth of its sentencing discretion; and that the trial court erred in failing to merge certain counts for sentencing purposes. We affirm Appellant's convictions for the reasons explained below.

The trial evidence showed the following. Jesus Cintron lived with his girlfriend, Charmisa Witherspoon, and her son, Devontae Jones. On October 5, 2008, Cintron left his home to attend a gang meeting for the 9 Trey Bloods, a subset of the Bloods gang. Cintron

---

consecutively to Count 17. All other original sentences remained the same.

Appellant filed a motion for new trial on November 29, 2010, which he amended through new counsel on July 15, 2022, and November 7, 2022. The trial court denied Appellant's motion for new trial on November 8, 2022. Appellant filed a notice of appeal on November 8, 2022, but we dismissed the appeal on February 23, 2023, because the case was still pending below due to Count 20 being dead docketed. The State moved to nol pros Count 20 on March 20, 2023, and the trial court granted the motion on June 16, 2023. Appellant filed an amended notice of appeal on January 7, 2025, and the case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

was killed during the meeting, and after he did not return home the next morning, Witherspoon called and left a voice message for a law enforcement officer.

Darryl Christmas was the leader of the 9 Trey Bloods. Christmas became aware that Witherspoon might work with law enforcement to locate Cintron, and he plotted to have Witherspoon and her son killed. Christmas held a meeting at his house with other gang members to discuss their plan. Tyeisha Marshall was a member of the 9 Trey Bloods. She testified that she, Appellant, Auletta, Marquise Robbins, and Tobin were gang members and were present for the meeting at Christmas's house. Robbins also testified that those gang members were present for the discussion about killing Witherspoon and Jones.

According to Marshall and Robbins, the plan was to ride over to Witherspoon's house and send Robbins inside first because Witherspoon trusted him. Once Robbins was inside, he was to call Marshall — who would be waiting outside in her truck with Appellant, Auletta, and Tobin — to tell her how many people were

4

inside Witherspoon's home. At that point, Auletta and Tobin were to leave the car, enter the house, and kill Witherspoon and Jones.

That plan, however, changed. Marshall testified that she drove Appellant, Auletta, Robbins, and Tobin from Christmas's home to Witherspoon's, and that on the way, Appellant said that he wanted to participate in the murder. Similarly, Robbins testified that, at some point between leaving Christmas's house and arriving at Witherspoon's, Appellant expressed "want[ing] to do it so he could prove that he could be aggressive." Appellant, however, who was age fourteen at the time of the crime, testified in his own defense that he had been dragged into the plan, even though he did not want to participate. Both Marshall and Robbins testified that Appellant took Tobin's place in the plan to commit the murders.

Once the gang members arrived at Witherspoon's house, Robbins walked to the front door alone, and Witherspoon let him inside. Robbins then walked to Jones's bedroom and briefly peeked his head in. After leaving Jones's bedroom, Robbins called Marshall and told her that it was "2:00." Robbins further testified that he told

Witherspoon he was leaving, and that Witherspoon came to help him open the door. According to Robbins, Auletta and Appellant then "bust[ed] through the house." Witherspoon similarly testified that she saw two men and a gun as Robbins opened the front door.

Robbins and Appellant both testified that Auletta ran through the house. According to Robbins, Appellant stayed near the front door while Robbins ran back to Marshall's vehicle and Witherspoon ran out of the house. Likewise, Witherspoon testified that she ran out of her house and to her neighbor's house when the men came inside her home. Appellant testified that once he was "sure" Witherspoon was "gone off the steps" of her front porch, he "pulled the gun out[ ] and . . . shot to the side one time[,]" missing Witherspoon.

Witherspoon testified that she glanced over her shoulder while she was running away and did not see anyone behind her. Once she made it to her neighbor's home, she began to bang on the door, but no one answered. As she continued banging on the door, she heard two gunshots come from her home. Robbins testified that Auletta

6

eventually left Witherspoon's house, went to Witherspoon's neighbor's house, took the gun from Appellant, and tried to shoot Witherspoon but could not because the gun was jammed. Likewise, Witherspoon testified that she saw three men at the neighbor's house shortly after she heard gunshots come from her own home. Witherspoon then picked up a large potted plant, and while laying on her back, used it to keep off one of the men who was attempting to put a gun to her head. Witherspoon testified that she heard Robbins's voice in the background saying, "Kill the b*tch, kill the b*tch." And she further testified to "hear[ing]" the gunman's attempt to shoot her twice because the gun made a "click[ing]" sound. The gun did not fire, and the men retreated.

Marshall testified that she could not see much from her truck, but that she heard three or four gunshots, Witherspoon screaming, and Robbins saying, "Shut up, b*tch," "Get that b*tch[,]" and "Let's go[.]" She further testified that, after the failed attempt to kill Witherspoon, Appellant returned to the truck, followed by Auletta, and that she drove all of the gang members away from the scene.

7

Witherspoon returned to her home after the men retreated and found her son and his dog dead at their house.

1. On appeal, Appellant contends that trial counsel was constitutionally ineffective for failing to communicate a plea offer for life with the possibility of parole, which Appellant claims he would have accepted. This claim fails.

At the motion for new trial hearing, Appellant and trial counsel both testified. Appellant testified that he did not recall being presented with a plea offer, and that he would have accepted an offer of life with the possibility of parole if it had been presented to him.[2] Trial counsel also said that he did not recall whether he

---

[2] We note that, in 2008 when the crimes were committed, a life sentence with the possibility of parole was the only sentence which could have been presented in a plea offer to Appellant because the State did not seek the death penalty against him, and Appellant had no prior convictions. See *Kimbrough v. State*, 300 Ga. 516, 518-520, 518 n.5 (3) (796 SE2d 694) (2017) (explaining that a sentence of life without the possibility of parole was permitted for a murder committed before 2009 only if the State noticed its intent to seek the death penalty or if the defendant was subject to recidivist sentencing under OCGA § 17-10-7 (b)). See also *Fleming v. State*, 271 Ga. 587, 589 (523 SE2d 315) (1999) ("[I]n general, a crime is to be construed and punished according to the provisions of the law existing at the time of its commission."). Accordingly, at issue is whether trial counsel failed to communicate a plea offer for an aggregate sentence of life, as opposed to the sentence which Appellant actually received, life plus a number of consecutive years.

communicated the State's offer of life with the possibility of parole to Appellant. But trial counsel testified that he "begged" the prosecution for a more lenient offer, and that those discussions were something he "would have" conveyed to Appellant because his general practice was to "tell [his] client . . . what [he] said" and how the prosecution "repl[ied]" "anytime [he] talked to the prosecution[.]" Trial counsel further testified that he "would have conveyed" to Appellant that the prosecution's life offer was parolable, and that it was his habit to "write out everything[,]" tell his client "what the worst case" would be, and then "give . . . a recommendation."

In its order denying Appellant's motion for new trial, the trial court found that trial counsel communicated the plea offer to Appellant based on trial counsel's testimony, which the court credited over Appellant's "self-serving" testimony. And on that basis, the trial court concluded that Appellant had not established deficient performance.

To prevail on his ineffective-assistance claim, a defendant "must show both that his counsel's performance was constitutionally

deficient and that he was prejudiced by this deficient performance." *Lynn v. State*, 310 Ga. 608, 612 (4) (852 SE2d 843) (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficiency, a defendant must show that trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Woods v. State*, 312 Ga. 405, 410 (III) (1) (862 SE2d 526) (2021) (citation omitted). And to establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lynn*, 310 Ga. at 612-613 (4) (citation and punctuation omitted). If a defendant "fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Stallworth v. State*, 304 Ga. 333, 334 (2) (818 SE2d 662) (2018).

The United States Supreme Court has held that, as a general rule, trial counsel has a duty to communicate formal plea offers "that may be favorable to the accused." *Missouri v. Frye*, 566 U.S. 134, 145

(II) (B) (132 SCt 1399, 182 LE2d 379) (2012). "Where a defendant alleges that a plea offer was not disclosed to h[im], the defendant 'must show the outcome of the plea process would have been different with competent advice.'" *Jacobs v. State*, 306 Ga. 571, 574 (2) (a) (832 SE2d 363) (2019) (quoting *Lafler v. Cooper*, 566 U.S. 156, 163 (II) (B) (132 SCt 1376, 182 LE2d 398) (2012)). To establish prejudice in this context, a defendant must show:

> (1) that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), (2) that the court would have accepted its terms, and (3) that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Id.

Here, Appellant has not established deficient performance. Although Appellant contends that trial counsel was deficient for failing to communicate a plea offer to him, the trial court found that trial counsel communicated the State's plea offer. And that factual finding, which was supported by the record, was not clearly

11

erroneous because trial counsel testified that it was his custom to "write out everything," communicate plea offers to his clients, and give his own recommendation of whether to accept the plea offer. Trial counsel also testified that he "begged" the prosecution for a more lenient offer and that his discussions with the State were something that he "would have" conveyed to Appellant. Accordingly, this claim fails. See *Bryant v. State*, 306 Ga. 687, 693-696 (2) (a) (832 SE2d 826) (2019) (affirming that trial counsel was not deficient "in how she handled . . . plea negotiations" because (1) the trial court was "entitled to believe" trial counsel's testimony that she discussed with the appellant the risks of going to trial and the possibility that he might be sentenced to life without parole and (2) the trial court was "entitled to disbelieve" the appellant's testimony that his counsel did not convey to him that if he opted to go to trial and decided against testifying, the jury would not be instructed on voluntary manslaughter); *Green v. State*, 279 Ga. 687, 689 (620 SE2d 788) (2005) ("Although a witness may have no distinct . . . recollection of the details of a fact occurring in the course

12

of the routine of his business, he may testify as to his fixed and uniform habit in such cases and state that he knows that he did not vary from that habit.") (citation and punctuation omitted), overruled on other grounds by *Lejeune v. McLaughlin*, 296 Ga. 291, 297 (2) (766 SE2d 803) (2014).

2. Appellant makes three arguments related to the sentencing phase of his trial. First, Appellant argues that he was denied counsel because trial counsel "provided no assistance whatsoever" during sentencing, contrary to the Sixth Amendment's guarantee of the right to counsel at that stage of the proceeding. Second, Appellant argues that, during sentencing, the trial court "refused" to allow Appellant or his trial counsel an opportunity to speak in violation of his federal and state due process rights. Finally, Appellant maintains that the trial court's failure to conduct a presentence hearing violated his rights under OCGA § 17-10-2. For the reasons explained below, Appellant's arguments fail.

By way of background, at the sentencing hearing, which occurred immediately after the jury returned its verdict, a victim

13

advocate read a victim impact statement from Witherspoon's aunt. Immediately thereafter, the trial court called upon the State to give its sentencing recommendation for Auletta. The trial court confirmed the recommendation with the State and then addressed Auletta and his counsel saying, "Unless you've got something to say, sir, I'm going to go ahead and pronounce sentence at this time. Anything, Mr. Giudice? Mr. Auletta?"[3] Auletta's counsel declined to present any argument, and the court proceeded to sentence Auletta.

One by one, the trial court called each defendant's name and asked the State for its recommendation. But other than for Auletta, the trial court did not ask any of the remaining defendants or their counsel whether they had anything to say. The State gave its sentencing recommendation when it was Appellant's turn to be sentenced. The trial court then told Appellant that he was "the saddest part of th[e] whole process with the exception of the victims" because he was "very, very young" when everything "went down." The trial court also told Appellant that he was a 14-year-old

---

[3] Mr. Guidice was counsel for Auletta.

"predator" who was "trying to sharpen [his] claws[,]" who was "probably one of the most dangerous people in th[e] courtroom[,]" and who may never "know the difference between right or wrong." The court further stated its belief that it was "fully [Appellant's] intention" to kill Witherspoon, and that she was living by "the Grace of God[.]" The court then imposed Appellant's sentence which was life plus forty-five consecutive years.[4] After announcing Appellant's sentence, the trial court asked Appellant whether he understood it, and Appellant nodded his head in the affirmative.

At the motion for new trial hearing, trial counsel testified that he wanted to make an argument on Appellant's behalf at sentencing but that he was "shocked" that the trial court sentenced Appellant without first hearing from his defense counsel. Trial counsel further testified that he "thr[ew] [his] hands up[,]" but the judge "didn't even

---

[4] The trial court announced that it was sentencing Appellant to "life plus 55 years consecutive," but this appears to have been a miscalculation. Appellant was sentenced to "10 years concurrent" for Count 2, which would have resulted in a total sentence of life plus 45 consecutive years, rather than 55 consecutive years. Moreover, in a modified sentence, the court imposed Appellant to a sentence of life plus 45 consecutive years.

15

acknowledge [him]" and just "walked off" after sentencing Appellant. According to trial counsel, he failed to object or make any kind of statement because he was "just so taken aback" by the trial court's sentencing procedure.

If given the opportunity, trial counsel testified, he would have made several arguments during sentencing, including that Appellant's mother had kicked him out of the house, that Appellant could not drive, that Appellant had "no real means of support" outside of the gang, and that there was "no real reason to treat children like adults." Trial counsel further testified that he would have elaborated on another murder case in which he represented a juvenile who was doing well after being released from custody after turning 21 years old. According to trial counsel, he believed Appellant would "do well" too because he was "a bright kid." Trial counsel also testified that he believed that the trial court "already knew" that the idea of "sending children to prison with this super predator notion . . . had been debunked" and that "the law just hadn't caught up with it." According to trial counsel, he still wanted to "put

16

it on the record" that there was "no real reason to treat children like adults."

In its order denying the motion for new trial, the trial court found that it held a presentence hearing in which it heard a victim impact statement and the State's sentence recommendations in alphabetical order for each codefendant beginning with Auletta. And the court denied Appellant's motion for new trial, in part, because neither Appellant "nor his counsel provided any argument or evidence on mitigating the recommended sentence," and neither Appellant nor his counsel made "any objection to the trial court's sentence[.]"

(a) In his first sentencing-related challenge, Appellant argues that he was denied his Sixth Amendment right to counsel. Ordinarily, when a defendant claims that he was deprived of the right to assistance of counsel, courts assess whether the alleged deprivation caused prejudice to the defendant under *Strickland*. But in *United States v. Cronic*, the United States Supreme Court identified three "circumstances that are so likely to prejudice the

accused" that "[n]o specific showing of prejudice [i]s required[.]" 466 U.S. 648, 658-659 (III) (104 SCt 2039, 80 LE2d 657) (1984). The first and "[m]ost obvious" scenario that justifies presuming prejudice is when there is a "complete denial of counsel" during a "critical stage of . . . trial." Id. at 659 (III). The second scenario is when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[.]" Id. And the final scenario is when counsel is called upon "to assist the accused during trial," but "the likelihood that any lawyer, even a fully competent one, could provide effective assistance [without being given adequate time to prepare] is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-660 (III).

In the present case, Appellant asserts that trial counsel "did not speak at all [during sentencing] because the [trial court] refused to give him an opportunity to" and that this "amounted to a complete denial of counsel during a critical stage" under *Cronic*'s first exception. We disagree. In explaining *Cronic*'s first exception, the Supreme Court noted that it has "uniformly" presumed prejudice

18

"when counsel was either totally absent[ ] or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25 (III). But here, trial counsel was present for the entire sentencing proceeding. And because trial counsel did not object, putting the trial court on notice that he had an argument to make, the record does not indicate that the trial court took any steps to prevent such an argument. Accordingly, this is not a case falling within *Cronic*'s first exception. Compare *Geders v. United States*, 425 U.S. 80, 91 (96 SCt 1330, 47 LE2d 592) (1976) (holding that "an order preventing [the defendant] from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct-and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment"); *Herring v. New York*, 422 U.S. 853, 865 (II) (95 SCt 2550, 45 LE2d 593) (1975) (holding that the defendant was denied his constitutional right to counsel when the trial court orally denied his counsel's request to make summations).

Appellant also cites to *Bell v. Cone* and suggests that prejudice

should be presumed under *Cronic*'s second exception. *Bell v. Cone*, 535 U.S. 685 (122 SCt 1843, 152 LE2d 914) (2002). During the sentencing phase of *Bell*, a state capital case, defense counsel made an opening statement in which he discussed the mitigating evidence that came up throughout the trial, "suggested that [the defendant] was under the influence of extreme mental disturbance[,]" "urg[ed] that [the jury] choose life for his client," cross examined at least one Government witness, and successfully objected to certain Government evidence. Id. at 691 (I), 701 (III). On appeal, the defendant argued that *Cronic*, rather than *Strickland*, should apply to his claim that counsel rendered ineffective assistance during his sentencing hearing by failing to adduce mitigating evidence and waiving closing argument. See *Bell*, 535 U.S. at 696-697 (II). But the Supreme Court rejected the defendant's claim. The *Bell* Court reasoned that "an attorney's failure to test the prosecutor's case" during sentencing "must be complete" before prejudice can be presumed under *Cronic*. Id. at 697 (II). And because the defendant argued only that his counsel was ineffective at "specific points[,]" not

that his "counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole," the Supreme Court concluded that *Strickland* applied to the claim, rather than *Cronic*. Id at 697-698 (II).

We are unconvinced that *Bell* would require us to hold that *Cronic*'s second exception applies to Appellant's case. The *Bell* Court opined that prejudice is presumed under *Cronic*'s second exception when counsel "fail[s] to oppose the prosecution throughout the sentencing proceeding as a whole[.]" *Bell*, 535 U.S. at 697 (II). But as noted above, *Bell* was a state capital case. And sentencing proceedings in state capital cases — like in federal cases — tend to include the presentation of extensive argument and evidence. The sentencing phases of state capital cases, in particular, tend to be more detailed because they carry the additional weight of potential state executions. See *Woodson v. North Carolina*, 428 U.S. 280, 304 (III) (C) (96 SCt 2978, 49 LE2d 944) (1976) ("[I]n capital cases[,] the fundamental respect for humanity . . . requires consideration of the character and record of the individual offender and the

21

circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."). By contrast, sentencing proceedings in state non-capital cases in Georgia, like the present case, are commonly brief. And as a result, it is not uncommon for there to be little in the way of argument or evidence presented during a sentencing hearing. We are not persuaded that these types of brief sentencing proceedings were the kind that the *Bell* Court envisioned when it held that prejudice should be presumed when counsel "fail[s] to oppose the prosecution *throughout* the sentencing proceeding as a whole[.]" *Bell*, 535 U.S. at 697 (II) (emphasis supplied).

Moreover, in *Bell*, the Supreme Court declined to presume prejudice under *Cronic*'s second exception when the State made opening and closing arguments *and* presented evidence, but the defense put up no case of its own. *Bell*, 535 U.S. at 691-692 (I). We thus decline to apply *Cronic*'s second exception here, where the State only presented a victim impact statement and gave a sentencing recommendation but otherwise did not put up any additional

22

evidence for trial counsel to oppose during sentencing. Accordingly, we apply *Strickland* and decline to presume prejudice under *Cronic* and *Bell*.

Pretermitting whether trial counsel was deficient for failing to speak during Appellant's sentencing, Appellant cannot show prejudice, so his ineffective-assistance claim fails. At the motion for new trial hearing, trial counsel represented to the court that if he *had* spoken during the sentencing, he would have argued that there was "no real reason to treat children like adults[,]" that Appellant had no real means of support outside of a gang because his mother had kicked him out of the house, and that he was a "bright kid" who could do "well" like another client of his who was released from custody at the age of 21. But trial counsel also testified that the trial court "already knew" that there was no reason to treat children as adults. According to trial counsel, he simply wanted to put his argument "on the record." Indeed, the trial court told Appellant during sentencing that he was "the saddest part of th[e] whole process . . . because [he] [was] very, very young" when everything

"went down." The trial court further stated that Appellant was a "14-[year-old] predator[.]"

Appellant has failed to prove that trial counsel's arguments would have resulted in a different sentencing outcome such as the trial court exercising its broad sentencing discretion any differently by running more of Appellant's sentences concurrently, rather than consecutively. See *State v. Riggs*, 301 Ga. 63, 69 (2) (a) (799 SE2d 770) (2017) ("[T]rial courts have great discretion in determining whether to run sentences concurrently or consecutively."). This is because the trial court's statements show that it was already aware of Appellant's age, and trial counsel testified that the trial court "already knew" there was no reason to treat children as adults. See *Evans v. State*, 300 Ga. 271, 276, (794 SE2d 40) (2016) ("When sentencing, a trial court may consider any evidence that was properly admitted during the guilt-innocence phase of the trial[.]" (citation and punctuation omitted)). Cf. *Martin v. McCotter*, 796 F2d 813, 820 (IV) (5th Cir. 1986) (holding that counsel was not ineffective for remaining silent during the sentencing hearing when counsel

"participated vigorously in the guilt-innocence phase of [the defendant's] trial" and elicited "testimony that would seem relevant not only to the determination of guilt or innocence but also to the sentencing decision").

And to the extent that trial counsel would have made other arguments, for example, that Appellant's mother kicked him out of the house, it is not likely that those arguments would have resulted in a more favorable sentence for Appellant. This is especially so given the severity of Appellant's crimes, which included conspiring to murder a mother and her son, riding to the mother's house, assaulting the mother as she ran away, and being a party to the crime of killing the son. See *Martin*, 796 F2d at 819 (IV) (holding that, under *Strickland*, the defendant was not prejudiced by his counsel's silence during the sentencing stage because "[t]he violent nature of the [crime] supported the imposition of a heavy sentence"). For these reasons, Appellant cannot show that he was prejudiced by his counsel's deficient performance, and his ineffective-assistance claim fails.

(b) Appellant further argues that the trial court's sentencing procedure violated his due process rights under the federal and state constitutions.[5] These claims also fail. It has long been recognized that the "very essence" of due process is having a "meaningful opportunity to be heard." *Ramos v. Terry*, 279 Ga. 889, 891 (1) (622 SE2d 339) (2005) (citation and punctuation omitted). But Appellant cites no case law, and we have found none, standing for the proposition that a "meaningful opportunity to be heard" requires a trial court to ask the defense if it wants to comment on sentencing. Moreover, Appellant has not shown that he was *denied* such an opportunity because the record does not show that he requested an opportunity to be heard. Additionally, after the court imposed Appellant's sentence and asked him whether he understood it, Appellant nodded his head in the affirmative and failed to make any argument. Appellant therefore has not shown that his due process rights were violated, and his claim fails. See *Small v. State*, 285 Ga.

---

[5] Appellant does not differentiate his procedural due process rights under the federal constitution from his procedural due process rights under the state constitution or argue that one provides him greater protections.

App. 445, 446 (646 SE2d 292) (2007) (holding that the defendant's presence for sentencing was sufficient to satisfy the demands of due process when he and his counsel were present for the entire sentencing hearing and had the opportunity to present evidence and to object but did neither).

(c) For his final sentencing-related claim, Appellant contends that the trial court violated OCGA § 17-10-2 because it failed to hold a presentence hearing in which trial counsel could "argue regarding the punishment to be imposed."[6] Appellant, however, did not

---

[6] OCGA 17-10-2 provides that,

   (a)(1) [e]xcept in cases in which the death penalty may be imposed, upon the return of a verdict of "guilty" by the jury in any felony case, the judge shall dismiss the jury and shall conduct a presentence hearing at which the only issue shall be the determination of punishment to be imposed. In the hearing the judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or nolo contendere of the accused, or the absence of any prior conviction and pleas.

   (2) The judge shall also hear argument by the accused or the accused's counsel and the prosecuting attorney, as provided by law, regarding the punishment to be imposed. Except in cases where the death penalty may be imposed, the prosecuting attorney shall open and conclude the argument. . . .

preserve this claim for ordinary appellate review. And plain error review does not apply because it is

> limited to the sentencing phase of a trial resulting in the death penalty, a trial judge's expression of opinion in violation of OCGA § 17-8-57, and a jury charge affecting substantial rights of the parties as provided under OCGA § 17-8-58 (b), and, for cases tried after January 1, 2013, with regard to rulings on evidence, a court is allowed to consider plain errors affecting substantial rights although such errors were not brought to the attention of the court. OCGA § 24-1-103 (d).

*Miller v. State*, 309 Ga. 549, 552 (2) (847 SE2d 344) (2020). Accordingly, Appellant's claim is waived.

3. Appellant also argues that the trial court abused its discretion in sentencing him to a consecutive sentence on Count 18 — charging him with possession of a firearm during the aggravated assault of Jones — because the court did not understand that it was not required to run that sentence consecutively to the other sentences imposed. Appellant has waived this claim, however, because he raises it for the first time on appeal, and his sentence as

---

OCGA § 17-10-2 (a) (1) – (a) (2).

28

to Count 18 was not void given that it fell within statutory range. We also decline to review Appellant's claim for plain error for the reasons explained in Division 2 (c). See *Blash v. State*, 318 Ga. 325, 326, 337-338 (5) (b) (898 SE2d 522) (2024) (holding that the appellant had "not preserved his claimed sentencing error for appellate review because he failed to object and . . . plain error analysis d[id] not apply" but noting that we do "address . . . arguments to the extent that [they] challenge[ ] the voidness of . . . sentences").

The special concurrence argues that we should resolve Appellant's claim on the merits because we resolved a similar claim in *Williams v. State*, 306 Ga. 674 (832 SE2d 843) (2019). In *Williams*, the appellant argued that "the trial court erred when it ran his sentence for possession of a firearm consecutively both to his sentence for malice murder and to his sentence for the aggravated assault of [the victim]." Id. at 676 (2). We vacated the appellant's sentence in part and remanded for resentencing on the ground that the "record contain[ed] no evidence that the trial court understood"

29

that it could have "run [the appellant's] sentences consecutively to, or concurrently with, his sentences on other counts." Id. at 677 (2).

But contrary to the special concurrence's assertion, *Williams* cannot stand for the proposition that it is proper for us to address an unpreserved sentencing error given that *Williams* itself did not address a preservation-of-error issue. See *Ga. Dep't of Human Servs. v. Addison*, 304 Ga. 425, 427 n.3 (819 SE2d 20) (2018) (noting that "[a] decision of this Court obviously is not precedent for a point it does not actually address and resolve" and that a "question which merely lurks in the record . . . [is] not to be considered as having been so decided as to constitute precedent" (citation and punctuation omitted)). For all these reasons, Appellant's sentencing claim was waived, and we decline to address it on the merits.

4. Finally, Appellant argues that the count charging him with aggravated assault of Witherspoon should have merged with his conviction for conspiracy to murder Witherspoon and Jones. But Appellant was not convicted of conspiracy to murder Witherspoon and Jones because the trial court merged that count for sentencing

30

purposes with the count charging him felony murder of Jones.[7]

Thus, there was no conspiracy conviction into which the aggravated

assault of Witherspoon could have merged. And the aggravated

assault of Witherspoon could not have merged with the murder of a

different victim, namely, Jones. Cf. *Davis v. State*, 278 Ga. 305, 307

(3) (602 SE2d 563) (2004) (holding that the trial court erred in

merging two aggravated-assault counts together and that the court

should have instead imposed a sentence on the second aggravated-

assault count, where the first aggravated-assault count merged with

felony murder of a first victim and the second aggravated-assault

count concerned a second victim).

*Judgment affirmed. All the Justices concur, except LaGrua, J., who concurs specially, and Land, J., not participating.*

---

[7] We take no position on whether or not this merger was correct because it was not raised on appeal. See *Dixon v. State*, 302 Ga. 691, 696 (4) (808 SE2d 696) (2017) (noting that "we have the *discretion* to correct [a merger] error upon our own initiative" when the error is "so clear and obvious that it comes to our attention even without the help of any party" (emphasis added)).

LAGRUA, Justice, concurring specially, in part.

I concur fully in the judgment and in Divisions 1, 2, and 4.

I write separately because I would resolve on the merits the claim raised in Division 3 — that Robinson waived his claim that the trial court erred in imposing a consecutive sentence on Count 18 (possession of a firearm during the aggravated assault of Jones) because it did not understand that it had discretion to impose a concurrent sentence.

In *Williams v. State*, 306 Ga. 674, 677 (2019), we addressed the same claim and held that "where a trial court rules in a particular manner while erroneously believing that it lacks discretion to do otherwise, that is error." In *Williams*, we noted that "both the prosecutor and Williams's attorney told the trial court that the sentence on Williams's firearm possession conviction *had* to run consecutively to some other sentence." Id. Thus, it is clear that Williams did not raise the issue below. Nevertheless, we addressed the claim on the merits and determined that there was error because the record contained "no evidence that the trial court understood its

obligations differently" than what it had been told by the prosecutor and defense counsel. Id.

Robinson relies on *Williams*, which remains binding precedent. Applying that precedent, I would address the merits of Robinson's claim. Having reviewed the sentencing proceedings and orders as a whole, including the trial court's entry of a modified sentence, see Maj. Op. at 2 n.1, it appears that the trial court understood that it had discretion to impose a concurrent sentence on Count 18. Therefore, I would conclude that Robinson has failed to show that a remand for resentencing on Count 18 is required.